## WILLIAM W. SHIPPEN et al.

### *v.*

## MIFFLIN PAUL et al.

From a deed of lands conveyed by the defendant to complainants, a strip was excepted "for a public road or turnpike and for no other use," and was so described in a map of the premises filed in the county clerk's office at that time. A turnpike road was built on it. The defendants afterward encroached on the strip by erecting buildings &c. thereon. On bill for an injunction to prevent the turnpike company from removing such encroachments—*Held,* that it constituted no ground for relief that there were informalities in the organization of the turnpike company, nor that the turnpike company had not, by legislative grant, obtained the public easement over the strip—the turnpike having been built and large sums of money spent thereon with complainants' knowledge and acquiescence; nor that the taking of tolls thereon was suspended when the encroachments were made, such suspension being merely temporary on account of the destruction of a bridge at the terminus of the turnpike.

---

Bill for injunction. On final hearing on pleadings and proofs.

Shippen *v.* Paul.

*Mr. C. Haight,* for complainants.

*Mr. J. S. Applegate,* for defendants.

THE CHANCELLOR.

This suit is for a perpetual injunction to restrain the defendants, officers of the Highlands and Seabright Turnpike Company, from entering on the complainants' land at Seabright, and pulling down and removing fences, barns and out-houses &c. thereon. The land in question, and which it is the object of this suit to protect against the defendants' claim to dominion over it, is a strip of land about twenty-eight feet wide, in the rear of the lots of the complainants, on the ocean front, on which their seaside cottages are built. The bill states that the tract (of about seventy acres) of which the premises in question are part, was bought by Messrs. Shippen and Dod, two of the complainants, through the defendant Paul, as their agent; that they paid all the purchase-money; that the deed was made to Paul and he executed and delivered to them a declaration of trust; that subsequently he obtained from them an interest, one-third, in the property, and that afterwards he and they made a division of the property among them by "deeds of quit-claim, release or partition;" that in those deeds a strip of sixty-six feet in width, of which the land in question is part, was reserved for a road or turnpike; that the turnpike company was incorporated in 1875, and, after a pretended organization had been made, proceeded to construct a turnpike, to the construction of which the complainant Shippen and others contributed about $2,300; that soon after the road was built the whole project of maintaining a turnpike road was abandoned, and the complainants, acting upon the fact of such total abandonment, laid out large sums upon the public highway on part of the sixty-six-feet strip in the rear of their respective properties, and built barns, fences &c. on other parts of it immediately adjoining their lots; that the turnpike company never acquired the right to the sixty-six-feet strip, or any part of it, or to any use of it in any way; that the project having been abandoned for three years, Paul, in April, 1879,

sought to effect a new organization of the company solely in his own interest and for his own benefit, and to enable him to defraud the complainants; that such organization was illegal, because the charter was forfeited by failure to obtain the required subscriptions to stock within the time limited for the purpose in the act, and that in pursuance of Paul's design unjustly to compel the complainants to pay him a large sum of money, notice was given by the secretary of the company, on the 16th of April, 1879, to the complainants, that they had encroached on the turnpike, and must remove the encroachments at once, and Paul, claiming to act as superintendent of the company, threatens to move the barns, fences &c. which the complainants have erected on the sixty-six-feet strip.

This case was before the court on a motion to dissolve on bill and answer. The motion was denied, because the turnpike company showed no right to the land in question, and it seemed best to retain the injunction until the final hearing. *Shippen* v. *Paul, 4 Stew. Eq. 439.* Now that the evidence is in, it appears, according to the weight of evidence, that the property (the seventy acres) was bought, not as stated in the bill, by Paul for himself and Shippen and Dod, but by him on his own account, and was conveyed to him accordingly by deed dated June 25th, 1869; that on his purchase of it, and before the deed was delivered, he gave to the vendor, Dr. Conover, for $900 of the purchase-money, a railroad bond of $1000 belonging to him, which he was to have the right to redeem by paying the $900; and when the deed was delivered he gave a mortgage for the rest of the purchase-money. He subsequently let Messrs. Shippen and Dod into equal ownership of the property with him, and he and they made up in equal shares in cash the amount of the whole of the purchase-money, less a discount of $190 allowed to him by Dr. Conover on the part of it secured by mortgage. Of this money, Messrs. Shippen and Dod paid to Paul each $300 on the 1st of July, 1869, and with that money and $300 of his own, he redeemed the railroad bond. They paid the rest of their shares of the money to him (each paying $1,423.33⅓) on the 17th of the same month; and he, con-

tributing a like amount, took up the mortgage. The considera-. tion of the deed to him is $5,360. The moneys paid amounted, altogether, to $5,170. The rest is the discount, $190, before mentioned, allowed on the money secured by mortgage. Mr. Paul, it may be remarked, is corroborated in his statement that he gave a bond and mortgage for part of the purchase-money by Mr. Corlies, who drew those papers; and no attempt is made to contradict his statement that he gave the railroad bond on account of the purchase-money, as before mentioned. When Paul let Shippen and Dod in, he executed a declaration of trust declaring his and their respective interests in the property. Afterwards, and in January, 1872, he conveyed to them respectively, for their respective shares, certain lots, pursuant to an agreement of partition made by him and them. In the deeds to them, he excepted and reserved out of the lands conveyed to them, a strip of land belonging to the railroad company, and a strip sixty-six feet wide, as laid down on a map which he had caused to be made of the property, and which is filed in the Monmouth county clerk's office, along the east and west sides of and adjoining the railroad company's land (part of it is on the east and part on the west side of the railroad company's land), declaring that that strip shall be " for a public road or turnpike, and for no other use." The turnpike company was incorporated in 1875. (P. L. of 1875, p. 191.) It was authorized to construct a turnpike road from the Highlands station, on the Long Branch and Sea Shore railroad, to Seabright station, beginning one hundred feet south of the easterly abutment of the Navesink bridge, at the Highlands, and ending at the easterly abutment of the bridge across the Shrewsbury river at Seabright. The act provides that the turnpike road shall be at least twenty-five feet in breadth along the middle, as nearly as may be, of the highway. It also provides that the capital stock of the company shall be $10,000, with liberty to increase it to $15,000, to be divided into shares of $25 each; and that when eighty shares shall be subscribed for ($2 a share to be paid in on subscribing, and the rest in installments, at the call of the president and directors of the company), the persons holding them shall be a corporation

by the name of the Highlands and Seabright Turnpike Company. The act provides that twenty days' notice of opening the books shall be published in at least two newspapers published in this state. By the fourth section it is provided that if the eighty shares should not be subscribed for in three years from the opening of the books, the act and all the subscriptions should be null and void. The next section provides that when the eighty shares shall have been subscribed, a meeting of the stockholders for organization shall be called on twenty days' like notice. The first notice for subscriptions to the stock was given in 1875. It was published in only one newspaper, instead of two, as the charter directed. Mr. Corlies testifies that on the day fixed in the notice for the meeting, not less than forty shares were subscribed, and the whole of the requisite eighty were obtained in the course of the next three or four days. The subscriptions appear to have amounted to $2,150. An organization was then made, and a contract for constructing the turnpike was subsequently (May 1st, 1875), and after bids from him and others had been received and considered, entered into by the company with Mr. Paul. By it he was required to finish the road in two months, which time would expire on the 30th of June, 1875. He finished it within the time, and the work was accepted. He was to receive as his compensation, $7,500, of which $1,500 were to be paid in stock of the company; $1,000 in bonds of the Navesink Bridge Company, or of the turnpike company, at the option of the latter; and $5,500 in cash, in installments of $2,000, on or before May 28th, 1875; $2,000 on or before June 28th, 1875; and $1,500 at the completion of the work. He appears to have received the stock and bonds, and some money, but he and the company claim that there remain due to him $4,466.11, besides interest. About the time the work was completed, the draw of the Navesink bridge, at the Highlands, was broken by the collision of a schooner with it, and it was not repaired for three or four years. By reason of the impassable condition of that bridge, the turnpike was rendered useless except for travel on the east side of the river, and no attempt was made to take tolls upon it until after the bridge was repaired, which was in

1878.    In that year, after the bridge had been repaired, the company resolved to repair the road and take toll, and appointed Paul to make the repairs and take the tolls.    He set up a toll-house and gate, and took toll for a few days, but 'the attempt to take tolls met with violent opposition on the part of the complainants and others, and he moved the toll-house and gate away.    The opposition not only denied the right of the company to take tolls, but denied that the company had a legal existence, because notice of opening the books of subscription to the stock in 1875 was published in only one newspaper, instead of two, as directed by the charter.    To remedy the defect, if it existed, the company afterwards, in 1879, again gave notice of opening the books (this time in two newspapers), and took subscriptions to the stock.    Eighty shares having been subscribed, a new organization was made in November of that year, and the company proceeded to repair the turnpike and to remove encroachments. Out of its action with respect to the latter, this litigation arose.

The legality of the organization of the company cannot be called in question, in this proceeding.    The company was, in fact, organized under its charter, in 1875.    It took subscriptions to its stock in that year, though it never issued any scrip or certificates therefor, but merely gave receipts.    The construction of 'the turnpike was the object for which it was created.    It therefore, in building the road, was not acting *ultra vires*.    Its occupation of the *situs* of the land reserved for a public road or turnpike, in the conveyances by Paul to Shippen and Dod, is proved to have been with the consent of Paul, who held the legal title to it (though, as to two undivided thirds, he held it for Shippen and Dod), and without objection on the part of Messrs. Shippen and Dod, and with their implied consent, though it, in fact, never received any grant nor any written evidence of the right to occupy the land.    Both Shippen and Dod contributed funds to the construction of the turnpike on that land, and they are to be regarded as having stood by and seen a very considerable expenditure (said to be $7,000) made in the construction of the road.    If the complainants are entitled to an injunction, it must be on the ground that they are entitled to protection absolutely in their occupation

of the land in question.  That they are not so, is clear.  The land had, when they began their occupation of it, been, as before stated, dedicated to public use as a road or turnpike; and, by the construction of the turnpike upon it, it was merely applied to the use to which it was dedicated.  The legislature, indeed, had not given the company the right which the public had to the right of way or easement over it, but to the use of the road as a turnpike by the company, Messrs. Shippen, Dod and Paul had all fully assented, and the work had been done upon it accordingly.  Though no tolls were taken for about three years, it appears to have been for what appeared to the company a sufficient reason—the fact that the Navesink bridge was impassable, and therefore the travel was insignificant.  That fact, however, did not prohibit the taking of tolls.  By its refraining from taking tolls during that period, the company did not lose the right to do so.  Nor did it, by its failure to keep the road in good condition during that time, forfeit its rights.  Nor is it estopped, by acquiescence, from taking steps to remove the encroachments.  The public right which it asserts has not been lost by the acquiescence of the company.  The right of the public, acquired by the dedication, cannot thus be forfeited or lost.  The complainants stand before the court without legal or equitable right or claim to the relief which they seek, and the bill must therefore be dismissed.  The decree will be with costs.